# IN THE UNITED STATES DISTRICT COURT FOR THE
# NORTHERN DISTRICT OF OKLAHOMA

WORLD PUBLISHING COMPANY,      )
                                         )

                   **Plaintiff,**             )

                                          )

vs.                                          )       No. 09-CV-574-TCK-TLW

                                          )

UNITED STATES DEPARTMENT OF      )

JUSTICE, and its subordinate bureau,      )

UNITED STATES MARSHALS SERVICE,      )

                                          )

                   **Defendant.**          )

## OPINION AND ORDER

Before the Court are Defendants' Motion to Dismiss or, Alternatively, Motion for Summary Judgment (Docs. 8 and 10); Plaintiff's Fed. R. Civ. P. 56(f) Motion to Deny Defendant's Motion for Summary Judgment or Continue the Response to Obtain Discovery in this Case and Brief in Support (Doc. 24); and Defendant's Motion to Strike Plaintiff's Request for Summary Judgment and Plaintiff's Statement of Material Facts ("Motion to Strike") (Doc. 33).

## I.      Factual Background

Plaintiff World Publishing Company ("Tulsa World") is the publisher of the Tulsa World, a newspaper of general circulation in the State of Oklahoma. The United States Marshals Service ("USMS") is a subordinate bureau of Defendant the United States Department of Justice ("DOJ") (collectively "Defendants"). This case involves Tulsa World's request for the booking photographs of six individuals, which was made pursuant to the Freedom of Information Act ("FOIA"), 5 U.S.C.

§ 552.[1]  At the time of the FOIA request, these six individuals were indicted on federal charges, detained, and awaiting trial.[2]

## A.    Source and Location of Requested Booking Photographs

The USMS Northern District of Oklahoma ("USMS N/OK") houses certain federal prisoners in its custody at the Tulsa County Jail pursuant to a contract with Tulsa County.  The contract does not discuss booking photographs, and USMS N/OK maintains booking photographs of prisoners in its custody.  Such photographs are either taken by or obtained by USMS and "are not routinely provided to the Tulsa County Sheriff."  (Decl. of William Bordley ("Bordley Decl.") ¶ 7.)  The Tulsa County Sheriff's Office ("TCSO") is permitted to create and maintain its own booking photographs for independent record keeping purposes, but any such photographs are not provided to or maintained by USMS N/OK.  USMS N/OK, and not TCSO, took all six booking photographs that were the subject of the FOIA request leading to this litigation.  (*See id.* ¶¶ 16, 18, 21, 23, 26, 28.)

Federal booking photographs, including those requested in the underlying FOIA request and appeal, are maintained in a federal database known as the Prisoner Processing and Population

---

[1]    Booking photographs are commonly referred to as "mug shots."

[2]    These individuals no longer hold this status, and all their criminal proceedings have concluded.  However, this case fits into an exception to the mootness doctrine for issues that are "capable of repetition, yet evading review."  *See generally McKeen v. United States Forest Servc.*, 615 F.3d 1244, 1255-56 (10th Cir. 2010) (explaining that such exception "preserves the justiciability of an issue where: (1) the duration of the challenged conduct is too short to be fully litigated prior to its cessation or expiration, and (2) there is a reasonable expectation that the same complaining party will be subject to the same action again") (internal quotations omitted).  Due to speedy trial laws, federal indictees awaiting trial do not generally maintain such status long enough for a civil FOIA lawsuit to take shape.  Further, Tulsa World has stated that it will continue to make FOIA requests for this same category of prisoners.  Therefore, the issues are justiciable despite the change in the photographed individuals' status since the time Tulsa World filed suit.

Management/Prisoner Tracking System ("PPM/PTS"). Absent consent of the subject individual, booking photographs located in the PPM/PTS "system of records" are statutorily protected from disclosure. *See* 5 U.S.C. §§ 552a(5) (defining "system of records"), 552a(b)(2) (prohibiting disclosure of record contained in a "system of records" without consent of subject individual, unless request is made and disclosure is required under FOIA). Thus, federal booking photographs may not be released without consent of the subject individual, except pursuant to an FOIA request.

### B. USMS Policy and Federal Regulations

USMS's relevant policy, which is set forth in a document entitled USMS Directives and in a section entitled "Information Dissemination - Media - Media Policy," provides: "Booking photographs may be released only for fugitives in order to aid in their capture. Prisoner bookings are confidential, and media representatives will not be advised of, or allowed to be present during, the proceedings." (USMS Directive 1.3(A)(3)(i), Ex. B to Defs.' Mot. for Summ. J.) It further provides that "[p]ost-arrest photographs of a prisoner will not be released to the news media unless a law enforcement purpose is served." (*Id.* at 1.3(A)(3)(c)(5).) These two provisions are collectively referred to as the "Policy."[3] Federal regulations are consistent with the Policy. *See* 28 C.F.R. § 50.2(b)(7)-(8) (providing that DOJ "should not make available photographs of a defendant unless a law enforcement function is served thereby," but that such policy "is not intended to restrict the release of information concerning a defendant who is a fugitive from justice").

---

[3]     USMS applies an exception to the Policy in jurisdictions within the Sixth Circuit Court of Appeals, based on the Sixth Circuit's decision in *Detroit Free Press v. Department of Justice*, 73 F.3d 93, 97 (6th Cir. 1996). This decision is explained *infra* Part V.C.

### C.      FOIA Request and Appeal Process

On August 26, 2008, Ziva Branstetter ("Branstetter"), City Editor of Tulsa World, submitted a written FOIA request to DOJ ("8/26/08 Letter"). The 8/26/08 Letter was not on Tulsa World letter head, but the Tulsa World logo and return address appeared on the envelope in which the letter was sent. Branstetter signed the request as "City Editor, Tulsa World" and included her title of "Tulsa World city editor" in the return address appearing on the first page of the request. The request was for production of the booking photographs of six individuals who had been indicted on federal charges, arraigned, and detained pending trial. The request was based solely on these individuals' status as indicted persons accused of federal crimes and not based on any unique characteristics of the six individuals or their charges. The request provides:

> Pursuant to the federal Freedom of Information Act, 5 U.S.C. § 552, I request access to and copies of mugshots of the following prisoners held in the David L. Moss Criminal Justice Center in Tulsa, Okla.:
>
> Zobair Baig
> Estella Bonilla
> Cecilia Bonilla
> Francisca Bonilla
> Kimberly Chancellor
> Larry Wayne Barnes[4]
>
> These inmates are being held in the Tulsa jail awaiting trial pursuant to a contract between the U.S. Marshals Office and Tulsa County. We have requested mugshots of these prisoners from our jail and from Carroll Allbery, the chief deputy U.S. Marshal, and have been denied. Both parties cited U.S. Marshal Service policy regarding mugshots.
> . . .

---

[4]      Prisoner numbers were included in the letter but have been omitted from this Order.

. . .
As a representative of the news media I am only required to pay for the direct cost of duplication after the first 100 pages. Through this request, I am gathering information that is of current interest to the public and is being sought for dissemination to the general public.

If my request is denied in whole or part, I ask that you justify all deletions by reference to specific exemptions of the act. I will also expect you to release all segregable portions of otherwise exempt material. I, of course, reserve the right to appeal your decision to withhold any information or to deny a waiver of fees. As I am making this request as a journalist and this information is of timely value, I would appreciate your communicating with me by telephone, rather than by mail, if you have questions regarding this request.

Please provide expedited review of this request which concerns a matter of urgency. As a journalist, I am primarily engaged in disseminating information. The public has an urgent need for information about inmates held under contract in the Tulsa jail because the Tulsa World routinely writes stories about these individuals and have by policy been denied mugshots, which contribute to the public's understanding of the story. It is also important to address our request as soon as possible, as these individuals are awaiting trial and may be out of jail soon and moved into the prison system.

(8/26/08 Letter, Ex. E to Defs.' Mot. for Summ. J.) (footnote added).)

On September 15, 2008, Cynthia Castaneda ("Castaneda"), of USMS, sent an email to Branstetter's Tulsa World email address denying the request pursuant to 5 U.S.C. § 552(b)(7)(C) ("Exemption 7(C)") of the FOIA. On November 10, 2008, attorney Schaad Titus ("Titus") sent a letter entitled "Freedom of Information Act Appeal" to DOJ's Office of Information and Privacy. In this letter, Titus stated that Tulsa World requested the booking photographs and that Tulsa World was pursuing the appeal. On July 22, 2009, Janice Galli McLeod ("McLeod"), Associate Director of DOJ Office of Information Policy, sent a letter to Titus affirming USMS's denial and denying the appeal, citing Exemption 7(C). McLeod's letter also referenced Tulsa World, and not Branstetter, as the appellant.

Following denial of its appeal, Tulsa World initiated this lawsuit against USMS and DOJ pursuant to 5 U.S.C. § 552(a)(4)(B), contending that Exemption 7(C) does not apply to the requested booking photographs and that they must be disclosed under the FOIA. Defendants filed a motion to dismiss, arguing that Tulsa World lacks standing because Branstetter, and not Tulsa World, initiated the FOIA request. Alternatively, in the same motion, Defendants moved for summary judgment on grounds that Exemption 7(C) and/or 5 U.S.C. § 552(b)(6) ("Exemption 6") exempted the booking photographs from the FOIA's disclosure requirements. Tulsa World filed separate responses to both motions. In the response to Defendants' motion for summary judgment, Tulsa World set forth a statement of undisputed facts and also requested summary judgment in its favor. Tulsa World also filed a separate motion pursuant to Federal Rule of Civil Procedure 56(d), arguing that, in the event Tulsa World was not entitled to summary judgment, it should be allowed to conduct discovery before the Court ruled upon Defendants' motion for summary judgment ("Rule 56(d) Motion").[5]

## II.    Defendants' Motion to Dismiss

In their motion to dismiss, Defendants argue that Tulsa World lacks standing to bring this FOIA challenge. Because standing is a jurisdictional requirement, motions to dismiss based on lack of standing are governed by Federal Rule of Civil Procedure 12(b)(1). *Colo. Env't'l Coalition v. Wenker*, 353 F.3d 1221, 1227 (10th Cir. 2004).

---

[5]    Tulsa World's motion referenced former Federal Rule of Civil Procedure 56(f). Effective December 10, 2010, former Rule 56(f) is now contained in Rule 56(d).

## A.    Rule 12(b)(1) Standard

"Motions to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1) may take one of two forms."  *U.S. v. Rodriguez-Aguirre*, 264 F.3d 1195, 1203 (10th Cir. 2001).  "First, a party may make a facial challenge to the plaintiff's allegations concerning subject matter jurisdiction, thereby questioning the sufficiency of the complaint."  *Id.* "Second, a party may go beyond allegations contained in the complaint and challenge the facts upon which subject matter jurisdiction depends." *Id.* at 1003.  In addressing a factual attack, a court does not "presume the truthfulness of the complaint's factual allegations" but instead "has wide discretion to allow affidavits, other documents, and a limited evidentiary hearing to resolve disputed jurisdictional facts." *Rodriguez-Aguirre*, 264 F.3d at 1203; *see Breakthrough Mgmt. Group, Inc. v. Chukchansi Gold Casino and Resort*, 629 F.3d 1173, 1188 (10th Cir. 2010) ("Because a 12(b)(1) motion is a speaking motion and can include references to evidence extraneous to the complaint without converting it to a Rule 56 motion, the district court  had wide discretion to allow affidavits, documents and even a limited evidentiary hearing to resolve disputed jurisdictional facts under 12(b)(1).") (internal alterations and quotations omitted).  When a factual challenge is raised, the plaintiff ultimately bears the burden of presenting "affidavits or other evidence sufficient to establish the court's subject matter jurisdiction by a preponderance of the evidence." *Southway v. Central Bank of Nigeria*, 328 F.3d 1267, 1274 (10th Cir. 2003).

In this case, Defendants mounted a factual attack on paragraph 6 of the Complaint, which provides that "[o]n or about August 26, 2008, the Tulsa World . . . made a formal written [FOIA] request."  (Compl. ¶ 6.)  Defendants challenge this fact, arguing that the 8/26/08 Letter is an individual request by Branstetter rather than a request on behalf of Tulsa World.  Thus, in order to

defeat Defendants' motion to dismiss, Tulsa World must present evidence establishing the challenged jurisdictional fact – namely, that it made the FOIA request.

**B.      FOIA Standing**

"Any person who submitted a request for existing documents that the petitioned agency denied has standing to bring a FOIA challenge." *Three Forks Ranch Corp. v. Bureau of Land Mgmt., Little Snake Field Office*, 358 F. Supp. 2d 1, 2-3 (D.D.C. 2005) ("Because a corporate entity is unable to sign anything itself, it is permissible for an attorney or other agent to file a FOIA request on behalf of the corporation.") (internal citation omitted).  "Courts have generally held, however, that the attorney or agent must adequately identify that he or she is making the FOIA request on behalf of the corporation in order for the corporation itself to have standing to sue." *SAE Prod., Inc. v. Fed. Bureau of Investigation*, 589 F. Supp. 2d 76, 80 (D.D.C. 2008).

Tulsa World has met its burden of showing that Branstetter, in the 8/26/08 Letter, adequately informed Defendants that she was making the FOIA request on its behalf.  Although the 8/26/08 Letter is written in the first person, (*see* 8/26/08 Letter ("I request access . . .")), Branstetter signed the letter as "City Editor, Tulsa World" and provided her Tulsa World mailing address, phone number, and email address.  Further, she stated: "The public has an urgent need for information about inmates held under contract in the Tulsa jail because the *Tulsa World* routinely writes stories about these individuals and have by policy been denied mugshots, which contribute to the public's understanding of the story.  It is also important to address *our* request . . . ." (*Id.* (emphasis added).) There is no indication in the letter that Branstetter was a freelance journalist who wrote for several publications, and there is no indication that Branstetter planned to use the booking photographs in any capacity other than for publication in Tulsa World.  In addition, a reasonable reader would

conclude from the letter that Tulsa World was a local newspaper engaged in publishing news articles. *Cf. SAE Prod., Inc.*, 589 F. Supp. 2d at 81 & n.6 (holding that journalist's FOIA request was on journalist's individual behalf, rather than SAE Production's behalf, because journalist stated that "he frequently publish[es] articles in the mainstream media, am the author of five books, and make frequent television appearances" and because "there is no reason to presume that a reader would otherwise know that [SAE Productions] was a production and research news organization"). In this case, a reasonable reader would conclude that Branstetter requested the mugshots as an agent of and on behalf of a local newspaper.

Further, as Tulsa World argues, there is no question that Tulsa World prosecuted the entire administrative appeal in this case. Titus identified Tulsa World as the appellant in all relevant correspondence. In the final denial letter dated July 22, 2009, McLeod, the DOJ representative, herself identified the "Tulsa World, World Publishing Company" as the appellant. It is inconsistent for Defendants to assert Tulsa World's lack of standing in this case, after it acknowledged and identified Tulsa World as the proper appellant throughout the administrative appeal. Tulsa World has shown that, at all stages of the request and appeal process, Defendants were on notice that Tulsa World made the FOIA request and desired the booking photographs for use in its publication. Therefore, Tulsa World has satisfied its burden of establishing standing.

## III. Tulsa World's Rule 56(d) Motion

Tulsa World's Rule 56(d) motion requests discovery, in the event the Court intends to grant Defendants' motion for summary judgment.[6] As required by Rule 56(d), Titus submitted a

---

[6]     Simultaneous to its request for discovery, Tulsa World responded to the motion for summary judgment and also requested summary judgment in its favor.

declaration identifying specific reasons that "it cannot present facts essential to justify its opposition" to Defendants' motion for summary judgment. *See* Fed. R. Civ. P. 56(d) (allowing court to defer considering the motion, deny the motion, allow time for discovery, or issue other appropriate relief if a party shows by affidavit or declaration "that, for specified reasons, it cannot present facts essential to justify its opposition").

### A.       Discovery in FOIA Litigation

Before addressing the identified reasons for discovery, it is necessary to explain the limited role of discovery in FOIA litigation. "Typically, discovery is not part of a FOIA case, and the decision whether to allow discovery rests within the discretion of the district court judge." *Schiller v. Immigration & Naturalization Servcs.*, 205 F. Supp. 2d 648, 653 (W.D. Tex. 2002); *Code v. Fed. Bureau of Investigation*, 1997 WL 150070, No. 95-1892, at *8 n.36 (D.D.C. March 26, 1997) (noting that discovery is not often part of the litigation process in FOIA actions). This departure from the typical discovery process stems from peculiarities in FOIA litigation – namely, that federal courts generally "rely on government affidavits to determine whether the statutory obligations of the FOIA have been met." *Perry v. Block*, 684 F.2d 121, 126 (D.C. Cir. 1982) (explaining that agency affidavits are generally deemed trustworthy as to adequacy of search for documents and exempt status of documents). As explained by the Second Circuit, "[d]iscovery relating to the agency's search and the exemptions it claims for withholding records generally is unnecessary if the agency's submissions are adequate on their face, and a district court may forgo discovery and award summary judgment on the basis of submitted affidavits or declarations." *Wood v. Fed. Bureau of Investigation*, 432 F.3d 78, 84 (2d Cir. 2005) (internal quotations and citations omitted); *Code*, 1997 WL 150070, at *9 (explaining that, if government's affidavits are "adequate on their face,"

"discovery relating to an agency's search and the invoked exemptions is usually unnecessary") (denying motion for discovery where government's declarations asserted facts sufficient to support its invocation of the relevant FOIA exemption).

A government affidavit is deemed adequate on its face where it is "relatively detailed, non-conclusory, and submitted in good faith." *Ledbetter v. Internal Revenue Servc.*, 290 F. Supp. 2d 1232, 1236 (N.D. Okla. 2003). In addition, agency affidavits supporting a FOIA denial are accorded a presumption of good faith. *SafeCard Servcs., Inc. v. Sec. & Exchange Comm'n*, 926 F.2d 1197, 1200 (D.C. Cir. 1991). With these general principles in mind, the Court will address Tulsa World's requested categories of discovery.[7]

### B.      Release of Booking Photographs Outside Sixth Circuit

Tulsa World seeks to discover if Defendants have released booking photographs in response to any requests made outside the jurisdiction of the Sixth Circuit Court of Appeals, arguing that this is relevant to Exemption 7(C)'s balancing inquiry. William E. Bordley ("Bordley"), Associate General Counsel and Freedom of Information/Privacy Act Officer of the United States Marshals Office, submitted a Declaration in support of Defendants' motion for summary judgment ("Bordley Declaration"). Paragraphs 5 and 6 of the Bordley Declaration explain the Policy and the exception for prisoners within the jurisdiction of the Sixth Circuit Court of Appeals, based on the Sixth Circuit's decision in *Detroit Free Press v. Department of Justice*, 73 F.3d 93, 97 (6th Cir. 1996). Such declaration, which is entitled to a presumption of good faith, states that USMS follows the Policy in every other jurisdiction. (*See* Bordley Decl. ¶ 6 ("Within that jurisdiction [Sixth Circuit],

---

[7]      One category of requested discovery related to standing. Based on the Court's finding that Tulsa World has standing, this reason for discovery is moot and will not be addressed.

the USMS permits the disclosure of booking photographs in response to FOIA requests, even where no law enforcement purpose is served, under the circumstances addressed by *Detroit Free Press* . . . . However, because USMS believes that court decision is inconsistent with the FOIA, USMS retains its policy . . . for all other jurisdictions.").) This statement by Bordley is consistent with what occurred in this case. The Court finds no reason to allow discovery based on Tulsa World's speculation that Defendants have acted inconsistently with the Policy.

### C.     Posting of Captured Fugitives on USMS Website

Tulsa World seeks discovery from Defendants regarding whether USMS posts booking photographs of captured fugitives on its website. Such discovery, Tulsa World contends, could lead to evidence "as to whether the USMS rule is proper" and whether "a law enforcement purpose or public relations purpose is served." (Titus Decl. ¶ 3.) Tulsa World also contends that such discovery is relevant to dispute Defendants' Statement of Material Fact 2, which simply quotes the Policy and the relevant federal regulation. (Defs.' Mot. for Summ. J. ¶ 2.) Defendants concede that USMS posts booking photographs of certain captured fugitives on its website. Defendants argue, however, that such practice is irrelevant to its summary judgment motion because USMS's "own use of records in its possession is not subject to the FOIA, nor does the FOIA provide a basis for plaintiff to challenge whether an agency's actions outside of the FOIA context are 'proper.'" (Resp. to Rule 56(d) Motion 5.)

The Court will not allow this category of requested discovery. For purposes of summary judgment, the Court will assume that USMS engages in the practice of posting booking photographs on its website following a fugitive's capture, rendering any discovery request to prove such point moot. As explained below, however, the Court finds this practice only marginally relevant to the

issue of whether the booking photographs qualify for an FOIA exemption. To the extent the practice is relevant, it is fully addressed in the Court's summary judgment ruling.

**D.      Relationship/Communications Between USMS N/OK and TCSO**

This case is somewhat unique due to the contractual relationship between USMS N/OK and TCSO, pursuant to which TCSO houses federal prisoners awaiting trial. Tulsa World seeks to discover information regarding "disclosure of Mug Shots held by [TCSO] as part of its records, which are not the federal records of [USMS]" (Titus Decl. ¶ 4), as relevant to disputing Defendants' Statement of Material Fact 3. Defendants' Statement of Material Fact 3 provides that the Northern District of Oklahoma Marshal's Service

> creates and maintains its own booking photographs for all prisoners in Marshals Service custody, which are not routinely provided to Tulsa County. [TCSO] is permitted to create and maintain its own booking photographs for independent record keeping purposes, but any such photographs are not provided to or maintained by the Marshals Service.

(Defs.' Mot. for Summ. J. ¶ 3.) Tulsa World also seeks to conduct discovery "on the entire relationship between USMS and [TCSO]," as relevant to disputing Defendants' Statement of Material Fact 5, which provides:

> Shortly before August 20, 2008, [TCSO] contacted [USMS, Northern District of Oklahoma] about Marhsals Service policy concerning the release of booking photographs. Carroll Allbery, Chief Deputy U.S. Marshal, explained the Marshals Service policy against release without providing direction as to whether [TCSO] should release its own photographs in response to media inquiries.

(Defs.' Mot. for Summ. J. ¶ 5.)

Tulsa World has failed to show that this category of requested discovery is warranted. Tulsa World has a copy of the contract governing TCSO and USMS's relationship. Bordley has declared that USMS N/OK takes its own booking photographs, does not routinely provide them to TCSO, and

does not prevent TCSO from releasing its own booking photographs. Tulsa World has given the Court no reason to doubt the veracity of Bordley's explanation, and there is no basis for further inquiry regarding TCSO and USMS's relationship and/or communications.

**E.     Evidence Regarding Privacy Interests in Booking Photographs**

Tulsa World seeks discovery from Defendants regarding "its assertions of a strong privacy interest in Mug Shots." (Titus Decl. ¶ 7.) Although this request is unclear as to the precise discovery sought, it appears Tulsa World seeks to discover facts regarding the six subject individuals, attempting to factually distinguish this case from other federal cases holding that booking photographs have a negative or stigmatizing effect on the subject individual. Defendants counter that they have not presented any empirical "evidence" regarding booking photographs and that there is no need for such discovery.

The Court agrees that Defendants' motion for summary judgment does not depend on any empirical research or evidence regarding privacy interests in booking photographs. Instead, Defendants presented their motion in terms of legal arguments based on self-evident facts. Further, the issues presented are a matter of common sense that can be decided on a categorical basis, without reference to empirical evidence regarding booking photographs or facts surrounding the specific individual in the booking photograph. *See infra* Part V.D. Therefore, there is no need to allow this requested category of discovery.

**F.     Defendants' Prior Legal Positions**

Tulsa World seeks discovery "on the DOJ's position with respect to the application and holding" of legal authority on this issue. Tulsa World speculates that Defendants have taken a position on such authority that is contrary to that being asserted here. Such speculation is based on

a parenthetical description of a case appearing on a government website. The Court agrees with Defendants that discovery on this topic is unwarranted because (1) the government is entitled to change positions and legal arguments, and (2) the parenthetical explanation cited by Tulsa World, which the Court has carefully reviewed, is not necessarily inconsistent with Defendants' position here.

###    G.    Summary

In light of the limited role of discovery in FOIA cases and the presumptions that attach to agency declarations submitted in good faith, Tulsa World has failed to show that any of its categories of requested discovery are warranted. Specifically, it has failed to raise substantial questions concerning the content or good faith of the Bordley Declaration. *See Wood*, 432 F.3d at 85 (affirming district court's denial of discovery where plaintiff's assertions were conjectural and insufficient to justify discovery, in light of detailed, non-conclusory, good-faith agency affdiavits); *Military Audit Project v. Casey*, 656 F.2d 724, 751 (D.C. Cir. 1981) (affirming district court's denial of discovery where plaintiff did not raise substantial questions concerning the substantive content of the agency affidavits' assertion of an FOIA exemption); *Code*, 1997 WL 150070, at * 9 (denying request for discovery where agency affidavits were adequate and submitted in good faith). Therefore, the Court exercises its discretion to deny discovery and decide Defendants' summary judgment motion based on the briefs currently presented.

## IV.    Defendants' Motion to Strike

In its response to Defendants' motion for summary judgment, Tulsa World included a "[s]tatement of [a]dditional [f]acts [j]ustifying MSJ to the Tulsa World," (Resp. to Mot. for Summ. J. 4), and argued that it was entitled to summary judgment in its favor. However, Tulsa World did

not file its own motion for summary judgment. Defendants thereafter moved to "strike [Tulsa World's opposition to the extent that it purports to be a cross-motion for summary judgment because it violates [Northern District of Oklahoma Local Civil Rule 7.2(e)." (Mot. to Strike 1.)[8] Alternatively, Defendants (1) substantively responded to Tulsa World's statement of additional facts, and (2) requested that the Court consider such response in ruling on what it construes as Tulsa World's cross motion for summary judgment.

In response to the Motion to Strike, Tulsa World argued that it was not moving for summary judgment but was instead urging the Court to *sua sponte* grant summary judgment in its favor as a non-movant. *See generally Yu v. Peterson*, 13 F.3d 1413, 1415 n.3 (10th Cir. 1993) ("[I]f one party moves for summary judgment and . . . it is made to appear from all of the records, files, affidavits, and documents presented that there is no genuine dispute respecting a material fact essential to the proof of the movant's case, and the case cannot be proved if a trial should be held, the court may *sua sponte* grant summary judgment to the non-moving party.") (internal quotations omitted). Tulsa World did not oppose Defendants' alternative proposal of (1) construing its response as a cross motion for summary judgment, (2) permitting the cross motion despite violation of local rules, and (3) allowing the Motion to Strike to serve as Defendants' response to Tulsa World's statement of additional facts.

The Court concludes that Tulsa World moved for summary judgment in its response brief by (1) submitting a statement of additional material facts, and (2) repeatedly requesting summary judgment in its favor. When additional material facts are set forth by a non-movant and summary

---

[8]     Northern District of Oklahoma Local Civil Rule 7.2(e) provides that "[a] response to a motion may not also include a motion or a cross-motion made by the responding party." LcvR 7.2(e).

judgment is specifically requested in its favor, a response becomes a prohibited cross motion for summary judgment. Tulsa World's cited cases regarding *sua sponte* grants of summary judgment are inapposite. Were the Court to grant summary judgment in favor of Tulsa World, it would be pursuant to Tulsa World's request rather than *sua sponte*. Therefore, Tulsa World's response violated LCvR 7.2(e). However, in the interest of justice and in order to most fully address the issues presented, the Court will (1) construe Tulsa World's response as a cross motion for summary judgment; (2) adopt Defendants' unopposed alternative proposal of allowing the Motion to Strike to serve as their response to Tulsa World's cross motion for summary judgment; and (3) decide all issues as if presented by cross motions for summary judgment.

## V.    Parties' Motions for Summary Judgment

"Virtually all FOIA cases are resolved by summary judgment." *Ledbetter*, 290 F. Supp. 2d at 1235. "Summary judgment may be granted solely on the basis of agency affidavits if they are sufficiently detailed and submitted in good faith." *Id.* (internal quotations omitted). Here, the sole issue presented by the motions for summary judgment is whether Defendants have proven that the booking photographs are exempt from disclosure pursuant to Exemption 7(C) or Exemption 6. *See John Doe Agency v. John Doe Corp.*, 493 U.S. 146, 152 (1989) (explaining that the burden is on the withholding governmental agency "to sustain its action"); *Trentadue v. Integrity Comm.*, 501 F.3d 1215, 1226 (10th Cir. 2007) ("The federal agency resisting disclosure bears the burden of justifying withholding."). Whether an FOIA exemption applies is a question of law. *See Trentadue*, 501 F.3d at 1226 ("Whether a FOIA exemption justifies withholding a record is a question of law . . . .").[9]

---

[9]    For reasons explained below, the Court holds that Exemption 7(C) applies, and the Court does not reach Exemption 6.

## A. Purposes of FOIA

Public access to government documents is "the fundamental principle . . . that animates the FOIA." *John Doe Agency*, 493 U.S. at 151. FOIA "permit[s] access to official information long shielded unnecessarily from public view and attempts to create a judicially enforceable public right to secure such information from possibly unwilling official hands." *Id.* "The basic purpose of FOIA is to ensure an informed citizenry, vital to the functioning of a democratic society, needed to check against corruption and to hold the governors accountable to the governed." *Id.* at 152 (internal quotations omitted). This basic purpose reflects "a general philosophy of full agency disclosure unless information is exempted under clearly delineated statutory language." *Id.* (internal quotations omitted).

Given these purposes, the Supreme Court has explained that the nine statutory exemptions, *see* 5 U.S.C. § 552(b)(1)-(9), "must be narrowly construed" and that such exemptions should not "obscure the basic policy that disclosure, and not secrecy, is the dominant objective." *Id.* (internal quotations omitted). Nonetheless, the statutory exemptions "are intended to have meaningful reach and application." *Id.* According to the Supreme Court, the "broad provisions favoring disclosure, coupled with the specific exemptions, present and reveal the 'balance' Congress has struck" between "the right of the public to know and the need of the Government to keep information in confidence to the extent necessary without permitting indiscriminate secrecy." *Id.* The Tenth Circuit has further explained that public access to government information is not "all encompassing" and that "[a]ccess is permitted only to information that sheds light upon the government's performance of its duties." *Sheet Metal Workers Int'l Ass'n, Local No. 9 v. United States Air Force*, 63 F.3d 994, 996 (10th Cir. 1995).

## B. Exemption 7(C)

At issue here is Exemption 7(C), which provides:

> This section [generally requiring disclosure] does not apply to matters that are – records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information . . . could reasonably be expected to constitute an unwarranted invasion of personal privacy[.]

5 U.S.C. § 552(b)(7)(C). Exemption 7(C) requires the Court to: (1) determine if the requested records were compiled for law enforcement purposes, and, if so, (2) "balance the public's interest in obtaining '[o]fficial information that sheds light on an agency's performance of its statutory duties' against an individual's interest in maintaining privacy." *Trentadue*, 501 F.3d at 1235-36 (quoting *United States Dep't of Justice v. Reporters Comm. for Freedom of Press*, 489 U.S. 749, 773 (1989)). With respect to the privacy component of the balancing test, the Tenth Circuit has explained that "[t]he privacy interest protected encompasses the individual's control of information concerning his or her person and involves restriction of information to the use of a particular person or group or class of persons." *Trentadue*, 501 F.3d at 1236 (internal quotations omitted). With respect to the "public interest" component of the balancing test, the Tenth Circuit has explained that "[d]isclosure is in the public interest when it is likely to contribute significantly to public understanding of the operations or activities of the government." *Trentadue*, 501 F.3d at 1236 (internal quotations omitted); *see also Sheet Metal Workers Int'l Ass'n*, 63 F.3d at 996 (explaining that the Supreme Court has "narrowly defined" the public interest that must be balanced for purposes of Exemption 7 as the extent to which disclosure would serve the core purposes of the FOIA – namely, to contribute significantly to the public understanding of the operations or activities of the government).

Whether an invasion of privacy is warranted, *i.e.*, outweighed by the public interest served by disclosure, "cannot turn on the purposes for which the request for information is made." *Sheet Metal Workers Int'l Ass'n*, 63 F.3d at 997; *see also Reporters Comm.*, 489 U.S. at 772 ("[W]hether disclosure of a private document under Exemption 7(C) is warranted must turn on the nature of the requested document and its relationship to the basic purpose of the [FOIA] to open agency action to the light of public scrutiny, rather than on the particular purpose for which the document is being requested.") (internal citations and quotations omitted). Nor is the identity of the requesting party relevant to the balancing inquiry. *Reporters Comm.*, 489 U.S. at 771. Thus, a request by the press for purposes of publication in a news article must be treated the same as a request by "any other third party, such as a neighbor or prospective employer." *Id.* This is because the FOIA's "sole concern is with what must be made public or not made public." *Reporters Comm.*, 489 U.S. at 772 (internal quotations omitted).

### C.  Exemption 7(C) Applied to Booking Photographs - Circuit Split

In *United States Department of Justice v. Reporters Committee for Freedom of Press*, 489 U.S. 749 (1989), a reporter and association of journalists sought disclosure of the "rap sheet"[10] on Charles Medico, an individual associated with organized crime. The requested rap sheet was compiled and possessed by the FBI. The FBI denied the request, and the Supreme Court ultimately held that such denial was proper pursuant to Exemption 7(C). The Court held "as a categorical

---

[10]  The Court described "rap sheets" as documents "compiled pursuant to [federal statutory] authority, containing certain descriptive information, such as date of birth and physical characteristics, as well as a history of arrests, charges, convictions, and incarcerations of the subject." *Id.* at 752. The Court further explained that "local, state, and federal law enforcement agencies throughout the Nation that exchange rap-sheet data with the FBI do so on a voluntary basis" and that the "principal use of the information is to assist in the detection and prosecution of offenders." *Id.*

matter that a third party's request for law enforcement records or information about a private citizen can reasonably be expected to invade that citizen's privacy, and that when the request seeks no 'official information' about a Government agency, but merely records that the Government happens to be storing, the invasion of privacy is 'unwarranted.'" *Id.* at 780. *Reporters Committee* is important to this Court's analysis because it (1) authorizes courts to conduct categorical balancing rather than ad-hoc balancing in determining whether Exemption 7(C) applies, so long as "a case fits into a genus in which the balance characteristically tips in one direction," *id.* at 776, and (2) the Court's balancing analysis regarding rap sheets is highly persuasive and applicable to the booking photographs at issue here.

In *Detroit Free Press, Incorporated v. Department of Justice*, 73 F.3d 93 (6th Cir. 1996), the Detroit Free Press sought the release of booking photographs of eight individuals who were then under indictment and awaiting trial on federal charges. The Sixth Circuit held that no exemption justified USMS's withholding of the booking photographs and held that the FOIA request must be granted "to the extent that the [request] concerns ongoing criminal proceedings in which the names of the indicted suspects have already been made public and in which the arrestees have already made court appearances." *Id.* at 95 (emphasis added). The Sixth Circuit reasoned that the release of indictees' booking photographs could not "reasonably be expected to constitute an invasion of personal privacy," distinguishing booking photographs from rap sheets because rap sheets "disclose information that extends beyond a particular, ongoing proceeding and recreate information that, under other circumstances, may have been lost or forgotten." *Id.* at 97. Because there was no invasion of a personal privacy interest, the court did not conduct a balancing analysis as part of its holding. *Id.* In dicta, however, the court observed that "[p]ublic disclosure of mug shots in limited

circumstances can . . . serve to subject the government to public oversight." *Id.* at 98. Examples

of these "limited circumstances" could include, according to the Sixth Circuit, (1) revealing an error

in detaining the wrong person, and (2) revealing circumstances surrounding an arrest and initial

incarceration. *See id.* ("Had the now-famous videotape of the Rodney King beating in Los Angeles

never been made, a mug shot of Mr. King released to the media would have alerted the world that

the arrestee had been subjected to much more than a routine traffic stop and that the actions and

practices of the arresting officers should be scrutinized."). As explained *supra* Part IV.B, *Detroit*

*Free Press* caused Defendants to make an exception to the Policy  for jurisdictions within the Sixth

Circuit.

Judge Alan Norris dissented from the court's decision in *Detroit Free Press*.  Judge Norris

reasoned that disclosure of the indictees' booking photographs implicated personal privacy interests

because (1) booking photographs "relate[] a number of facts about a person, including his expression

at a humiliating moment and the fact that he has been booked on criminal charges"; (2) the Sixth

Circuit has held that booking photographs are "widely viewed by members of the public as

signifying that the person . . . has committed a crime"; and (3) the majority's characterization of

booking photographs as simply conveying one's appearance "misconceives" their true nature. *Id.*

at 99. Judge Norris then reasoned that the disclosure of the booking photographs "would serve no

public interest cognizable under the FOIA," particularly in light of the "presumption of legitimacy

that [it] accords to agency conduct" and the "utterly speculative" nature of any mistreatment or

erroneous arrests by USMS. *Id.* at 99-100.

Recently, the Eleventh Circuit rejected the holding in *Detroit Free Press* and aligned itself

with Judge Norris' dissent.  *See Karantsalis v. U.S. Dep't of Justice*, ___ F.3d ____, 2011 WL

846242, at *1 (11th Cir. March 11, 2011). Adopting the district court's decision as its own,[11] the Eleventh Circuit held that USMS properly withheld a booking photograph of an individual who was indicted on securities fraud charges pursuant to Exemption 7(C). The court found that the booking photograph implicated the individual's personal privacy interests because booking photographs are a "vivid symbol of criminal accusation, which . . . intimates, and is often associated with, guilt;" and found that "the public obtains no discernable interest in viewing the booking photographs, except perhaps the negligible value of satisfying voyeuristic curiosities." *Id.* at *4-5. Ultimately, the court concluded that the "balance weighs heavily against disclosure." *Id.* at *5. Thus, there is a circuit split on application of Exemption 7(C) to booking photographs.

One district court decision is also instructive. In *Times Picayne Publications Corporation v. United States Department of Justice*, 37 F. Supp. 2d 472 (E.D. La. 1999), the court held that USMS properly withheld a booking photograph pursuant to Exemption 7(C). The court (1) found that *Detroit Free Press* was inconsistent with *Reporter's Committee* and relevant reasoning in Fifth Circuit case law, *id.* at 476; (2) followed the dissent in *Detroit Free Press*, concluding that "[a] mug shot preserves, in its unique and visually powerful way, the subject individual's brush with the law for posterity," *id.* at 477; and (3) could not "discern how disclosure of [the mug shot] would serve the purpose of informing the public about the activities of their government," *id.* at 481. Ultimately, the court reasoned that the privacy interest at stake outweighed the purely speculative and non-existent public interest in disclosure.

---

[11]     *See Karantsalis*, 2011 WL 846242, at *1 ("The Order . . . entered by the district court . . . is a comprehensive and scholarly discussion of the issues and law surrounding this request and we hereby adopt it and attach it to this opinion.").

### D.        Exemption 7(C) Applied to Booking Photographs - Analysis

As an initial matter, the Court clarifies that it is conducting categorical balancing rather than ad-hoc balancing. Categorical balancing is appropriate because the "case fits into a genus in which the balance characteristically tips in one direction." *See Reporters Committee*, 489 U.S. at 776. The Court does not find it necessary or judicially feasible to evaluate each specific indicted individual's privacy interest in his or her mug shot. Instead, this is a situation that calls for categorical balancing and a categorical rule that leads to consistency in treatment within this judicial district. The specific category of booking photographs to which the Court's holding applies is booking photographs of federal indictees who are awaiting trial. Also as an initial matter, Defendants have satisfied the first prong of the Exemption 7(C) test by showing that the booking photographs constitute records "compiled for law enforcement purposes." Tulsa World has made no arguments to the contrary.

The crux of the dispute is the second prong – the privacy interest/public interest balancing. In accordance with Tenth Circuit and Supreme Court law, the Court will (1) examine the nature of the privacy interest and determine if it is the type of interest protected by Exemption 7(C); (2) examine the nature of the public interests served by disclosure and determine if such interests are within the scope of FOIA's purposes; and (3) balance any qualifying private and public interests to determine if the invasion of privacy resulting from disclosure is warranted.

### 1.        Privacy Interest

The individual "interest in avoiding disclosure of personal matters" is one type of privacy interest Exemption 7(C) protects. *Reporters Committee*, 489 U.S. at 762. Requested information is generally deemed "private" under Exemption 7(C) if it (1) concerns an individual's person; and (2) is restricted to the use of a particular person or group or class of persons, *i.e.*, not freely available

to the public.  *See Trentadue*, 501 F.3d at 1236 (internal quotations omitted); *see also Reporters Committee*, 489 U.S. at 763-64.

### a.    Does Booking Photograph Constitute Information Concerning an Individual's Person?

A mug shot is information concerning an individual's person because it is a visual depiction of the individual.  Common sense dictates that individuals desire to control dissemination of any visual depictions of themselves and consider such visual depictions "personal matters."  *See generally Nat'l Archives and Records Admin. v. Favish*, 541 U.S. 157, 166 (2004) (holding that FOIA "recognizes surviving family members' right to personal privacy with respect to their close relative's death-scene images" and that such images were exempted from disclosure by Exemption 7(C)).  The Court further finds that (1) booking photographs are stigmatizing depictions that preserve "in [a] unique and visually powerful way, the subject individual's brush with the law for posterity," and (2) indictees could reasonably "object to the public disclosure of his or her mug shot." *Times-Picayne*, 37 F. Supp. 2d at 477.  Even more than an ordinary photograph, citizens have a privacy interest – *i.e.*, an interest in avoiding disclosure of – booking photographs because of their stigmatizing effect and their association with criminal activity.  *See Karantsalis*, 2011 WL 846242, at *4 ("[A] booking photograph is a vivid symbol of criminal accusation, which, when released to the public, intimates, and is often equated with, guilt.").

The Court also concludes that federal indictees awaiting trial – the specific category of individuals at issue – are "private citizens" who maintain all privacy interests protected by the FOIA. Because the subjects of the booking photographs are "private citizens," the privacy interest jeopardized by disclosure is "at its apex."  *See Favish*, 541 U.S. at 166 ("In this class of cases where the subject of the documents is a private citizen, the privacy interest is at its apex.").  The Court

rejects any notion that federal indictees lose a privacy interest in their booking photographs simply because they have been charged with a crime, are the subject of ongoing criminal proceedings, and are therefore some type of "public figure" with reduced expectations of privacy. There is no precedent for importing "public figure/private person" distinctions or "expectation of privacy" standards from other areas of law to the Exemption 7(C) analysis. *See Reporters Committee*, 489 U.S. at 763 n.13 ("The question of the statutory meaning of privacy under the FOIA is, of course, not the same as the question whether a tort action might lie for invasion of privacy or the question whether an individual's interest in privacy is protected by the Constitution."); *Times Picayne*, 37 F. Supp. 2d at 478 (rejecting argument that "public figure" status plays any role in FOIA analysis and concluding that a person's status as a "public figure" does not eviscerate his or her privacy interests under the FOIA).

### b. Are Booking Photographs Restricted to a Group or Made Freely Available to the Public?

The category of booking photographs at issue are paid for, taken by, and generally restricted to use by Defendants.[12]  The Policy explained above prevents the disclosure of federal indictees' booking photographs to the news media and otherwise prevents their disclosure except for law enforcement purposes.  Therefore, the booking photographs at issue are, as a literal matter, not freely made available to the public.  *See Reporters Committee*, 489 U.S. at 764-65 (reasoning that "federal funds have been spent to prepare, index, and maintain [rap sheets]" and that "[rap sheets] would not otherwise be freely available either to the officials who have access to the underlying files or to the

---

[12]     The Court's holding has no impact on photographs taken by TCSO or other local law enforcement agencies.  This holding is limited to booking photographs created by USMS, such as the six booking photographs created and maintained by USMS in this case.

general public"). Instead, the booking photographs are subject to a "careful and limited pattern" of authorized disclosure, and their use is restricted to use by a particular group – namely, federal law enforcement officials. *See id.* at 765 (citing statutes and regulations authorizing release of rap-sheet information only under limited circumstances and to certain officials). In this case, the pattern of limited disclosure is evidenced by federal statute, federal regulation, the Policy, and the Bordley Declaration. Such declaration is entitled to a presumption of good faith, and the Court accepts that the Policy is indeed followed in every jurisdiction except the Sixth Circuit. *See Karantsalis*, 2011 WL 846242, at *4 (relying on Bordley affidavit for conclusion that booking photographs taken by USMS are generally not available for public dissemination).

Tulsa World argues that, because USMS posts booking photographs on its website after capturing a fugitive in order to "brag" about such capture, Defendants release the booking photographs for public relations purposes in addition to law enforcement purposes. This argument incorrectly assumes that law enforcement purposes cease to be served after a fugitive is captured. But even assuming no law enforcement purpose is served post-capture, this argument is of little relevance to the Exemption 7(C) analysis. The question presented is whether release of detained federal indictees' booking photographs implicates privacy interests, and there is no dispute that Defendants do not generally release such booking photographs for public viewing. Whether Defendants properly follow their own Policy in the case of captured fugitives does not impact the Court's conclusion in this regard. The crucial facts are that (1) federal booking photographs are not generally available to the public, such as in a library or court record, and (2) Defendants – the creators and possessors of the booking photographs – do not generally release booking photographs

for public viewing. In the Court's view, this is sufficient to satisfy the inquiry outlined in *Reporters Committee*.

Tulsa World further argues that federal booking photographs are "generally available to the public" because Tulsa County, all counties in Oklahoma, and most states release booking photographs taken by local authorities. State and local policies are relevant to the extent they demonstrate whether the law enforcement profession generally believes, or does not believe, that individuals have a privacy interest in certain information. *See Reporters Committee*, 489 U.S. at 767 (reasoning that, although state policies did not determine the meaning of a federal statute, they could provide evidence of general practices of disclosure or non-disclosure among the law enforcement profession). Assuming for purposes of this motion that a majority of states do release booking photographs taken by local law enforcement officials, this evidences that booking photographs – as a general category of law enforcement document – may not generally be deemed as "private" as rap sheets. *Cf. Reporters Committee*, 489 U.S. at 767 (fact that rap sheets were not generally released by local law enforcement authorities supported Court's conclusion).

However, it must be remembered that state booking photographs and federal booking photographs are distinct pieces of information. Bordley's Declaration, which carries a presumption of good faith, states that USMS does not routinely share federal booking photographs with local agencies. Therefore, booking photographs released by local agencies are generally different photographs than those taken by USMS. Different photographs are taken at different moments in time and may impart entirely different information. In other words, release of one booking photograph does not reveal precisely the same information as another booking photograph. Therefore, other law enforcement entities' policies of releasing booking photographs do not, in this

Court's view, remove the privacy interest that would otherwise attach under Exemption 7(C) to that same prisoner's *federal* booking photograph.

Citing *Detroit Free Press*, Tulsa World further argues that, due to the circumstances surrounding a booking photograph, the booking photograph has essentially already been made freely available to the public. *See Detroit Free Press*, 73 F.3d at 97 (reasoning, in part, that indictees did not enjoy a privacy interest in booking photographs because indictees had already been identified by name in a federal indictment and because "their visages ha[d] already been revealed during their prior judicial appearances"). The Court rejects this argument. The Supreme Court in *Reporters Committee* rejected a similar argument regarding information contained in rap sheets being previously disclosed to the public in bits and pieces and counseled against adoption of a "cramped notion of personal privacy." *Reporters Committee*, 489 U.S. at 763. Tulsa World's contention, and the *Detroit Free Press* decision, reflect a similarly cramped notion of personal privacy. Like rap sheets, booking photographs are "compilations of many facts that may not otherwise be readily available from a single source." *Id.* Specifically, booking photographs allow the public to piece together other publically available information in a unique manner. They allow the public to connect a name, criminal charges, and a face. Booking photographs are arguably even more private than rap sheets because the federal mug shot itself is not yet in the public domain at all. *See Times-Picayne*, 37 F. Supp. 2d at 477 n.3 (reaching same conclusion).

Second, even assuming the circumstances of an indictment rendered an individual's identity, appearance, and association with criminal charges freely available to the public, a mug shot captures an entirely different piece of private information. This private information is the individual's appearance at a particular moment in time. The private information contained in a mug shot has not

been somehow previously disclosed based on the indictment and prior judicial proceedings. Instead, a mug shot captures an expression and a moment in time not otherwise available to the public in any other manner. Because a booking photograph concerns an individual's person and is generally held for limited use by Defendants, federal indictees awaiting trial have a strong and significant privacy interest in their booking photographs.

### 2. Public Interest

Tulsa World contends that disclosure of the booking photographs "is likely to contribute significantly to public understanding of the operations or activities of the government," *see Trentadue*, 501 F.3d at 1236 (internal quotations omitted), because it will allow "scrutiny of USMS activities, law enforcement and how the court system handles charged but not yet convicted persons," (Resp. to Mot. for Summ. J. 6). Tulsa World provided nine examples of how disclosure of booking photographs is likely to serve the public interest: (1) to determine whether agents have arrested the correct person; (2) to show favorable or unfavorable treatment by the arresting agency; (3) to show fair or disparate treatment of prisoners; (4) to expose racial or ethnic profiling in making arrests; (5) to reveal the appearance of a prisoner, as this reflects upon the arresting agency's performance of its duties; (6) to compare the person's appearance at the time of arrest to his appearance at trial, as this shows whether the individual has been treated fairly; (7) to allow witnesses to come forward with information and assist solving other crimes; (8) to aid in the early capture of a fugitive prisoner; and (9) to show whether the indictee took the charges seriously. In sum, Tulsa World contends that the disclosure of booking photographs "is inextricably intertwined with the public criminal charges against that person and law enforcement or governmental agencies' duties such that it may tend to reflect whether or not the criminal charges have or do not have merit

and whether the federal authorities are properly prosecuting or failing to prosecute prisoners or others." (Resp. to Mot. for Summ. J. 8.)

The Court concludes that disclosure of federal booking photographs is not likely to contribute significantly to public understanding of federal law enforcement operations or activities. Examples 1, 7, and 8 relate to the public's increased ability to assist federal law enforcement agencies in accomplishing their objectives. It is an entirely speculative and dubious proposition that disclosure of booking photographs would, on balance, assist federal officials in catching more criminals or catching the correct criminals. Even if the public did assist on limited occasions, the public's interest in effective law enforcement is not the type of public interest within the core purposes of the FOIA. Example 9 – whether the indictee took the charges seriously – also does nothing to shed light on government activities or operations. The public may certainly be interested in this information, but this does not mean the release of such information serves any public interest recognized under the FOIA.

Examples 2-6, relating to uncovering government misconduct, are similar to the "Rodney King" example first set forth by the Sixth Circuit's dicta in *Detroit Free Press*. The Court agrees that uncovering government misconduct would further the core purposes of FOIA. However, this Court concludes that releasing booking photographs does nothing to meaningfully expose government law enforcement officials' conduct to public scrutiny. Specifically, the Court finds that an indictee's appearance at the time of his mugshot is not necessarily attributable to his treatment by law enforcement officials. It is equally, if not more, likely that an indictee's appearance is attributable to his conduct prior to arrest. Further, any differences between an indictee's booking photograph and trial appearance do not necessarily or likely reveal how he was treated by law

enforcement officials while in prison. Such differences could be attributable to any number of factors. Finally, the public's ability to identify, and presumably count, the number of arrests of a certain racial category is not likely to shed light on the existence of improper racial or ethnic "profiling." Even assuming the public could properly categorize individuals based on their booking photographs, sheer numbers are not likely to meaningfully contribute to this public discussion. After careful consideration of all identified public interests and examples thereof, the Court concludes that booking photographs are not likely to allow the public, in any meaningful way, to better understand the operations or activities of law enforcement officials. Therefore, disclosure does not shed light on law enforcement activities or operations and does not serve the core purposes of the FOIA.

### 3.    Balancing

The Court has concluded that (1) a strong personal privacy interest attaches to booking photographs taken by federal officials of federal indictees, even while such indictees are involved in ongoing criminal proceedings; and (2) disclosure of such booking photographs is not likely to contribute significantly to the public understanding of federal law enforcement activities and operations. The balance therefore tips decidedly in favor of privacy, and disclosure of the booking photographs could reasonably be expected to constitute an "unwarranted" invasion of personal privacy.

## VI.    Conclusion

The Court holds: (1) Tulsa World has standing to bring this FOIA action, (2) Tulsa World has not made a sufficient showing that it is entitled to discovery; and (3) Defendants properly withheld the requested booking photographs pursuant to Exemption 7(C). Therefore, Defendants' Motion to Dismiss (Doc. 8) is DENIED; Defendants' Motion for Summary Judgment (Doc. 10) is

GRANTED; and Plaintiff's cross-motion for summary judgment, which was contained within its response brief, is DENIED. Plaintiff's Fed. R. Civ. P. 56(f) Motion to Deny Defendant's Motion for Summary Judgment or Continue the Response to Obtain Discovery in this Case (Doc. 24) is DENIED. Defendants' Motion to Strike Plaintiff's Request for Summary Judgment and Plaintiff's Statement of Material Facts (Doc. 33) is DENIED. A separate judgment will be entered.

**IT IS SO ORDERED this 28th day of March, 2011.**

**TERENCE C. KERN**
**United States District Judge**